EXHIBIT 1

# FLYNN & WIETZKE, P.C.

1205 Franklin Avenue, Suite 370
Garden City, N.Y. 11530
Tel: (516) 877-1234   Fax: (516) 877-1177

Michael Flynn, Esq.                                                                Offices throughout the Northeast
Marc Wietzke, Esq. †                                                                    Toll Free: (866) 877-FELA

†Also admitted in NJ


March 2, 2012

Michael Mabee
Supervisory Investigator
OSHA Whistleblower Program
450 Main Street, Room 613
Hartford, CT  06103

Re:   JASON WORCESTER v. PAN AM RAILWAYS

Dear Mr. Mabee:

This office has been retained by Jason Worcester with regard to discriminatory and intimidating actions taken against him by his employer, Pan Am Railways. Please consider this Mr. Worcester's formal complaint against Pan Am Railways under the Federal Rail Safety Act, 49 USC §20109, the Railroad Whistleblower Law.

## STATEMENT OF FACTS

Mr. Worcester has been with the railroad for 16 years, all of it spent in the signal department. Through the years he has served as an Assistant Signalman, a Signal Maintainer, a Relief Signal Maintainer and became a Signal Foreman in 2006. As a Signal Foreman, Mr. Worcester was responsible for the safety of all of those whom he supervised. I say "was" because on November 28, 2011, Mr. Worcester was terminated because he expressed concern for the safety of a 22 year

old Signal Trainee with less than three months of railroad experience on the day in question.

On the day in question, Mr. Worcester was asked to send an excavator being used on a work site he was in charge of (Field Road) to another location (East Elm) for use in clean up of a hazardous chemical spill at East Elm. Because of the remoteness of the location, Mr. Worcester sent Mr. Butland to deliver the equipment, given Mr. Butland's familiarity with the East Elm area. At the time of the request, nothing was said to Mr. Worcester about needing an operator for the excavator.

Upon delivery of the machine, Mr. Pelletier, a high level supervisor, directed Mr. Butland to do the actual digging. Mr. Butland had never operated that equipment before, and expressly raised his concerns about using the equipment. Mr. Pelletier assured him it was ok and that everyone would "just stand way back, so you can't hurt us" and "we are B&B, so we can fix anything you break". Mr. Butland specifically asked if there was anyone else who could run the machine. He then operated the machine a bit, uncovering some of the dense soil and had to wait for a dumpster before he could do any additional work.

While waiting, Mr. Butland received a text message from Mr. Worcester. Recall that Mr. Worcester was only asked to deliver a piece of equipment to the East Elm site for use in clean up of a hazardous materials spill. No request for an operator was made and no information regarding the nature of the chemicals spilled was given to Mr. Worcester. Thus, Mr. Worcester, knowing how green Mr. Butland was, advised Mr. Butland not to participate in any of the hazardous spill clean up, i.e. not handle any of the contaminate materials. Mr. Butland then asked Mr. Worcester to speak to Mr. Pelletier.

At that point, Mr. Worcester came to the East Elm job site. On arrival, the first person he saw was an official looking woman. He approached her and learned that she was from the Maine Department of Environmental Protection. He asked her if the clean up taking place would result in the preparation of a report of any kind by the DEP. He was told it would, but that it would likely be months later, so she offered to give him a business card so he could request the report later.

During this conversation Mr. Pelletier aggressively approached and interrupted, taking Mr. Worcester away from speaking to the DEP investigator, terminating any further contact with her. Thereafter Mr. Pelletier advised Mr. Worcester that the hydraulic fluid spill being cleaned up was not all <u>that</u> hazardous, and agreeing to accept responsibility for Mr. Butland's welfare. Mr. Worcester then left the East Elm worksite.

Following the incidents listed above, Mr. Worcester was charged with various violations. The charges stated:

> Specifically, on October 7, 2011, at the Field Road and East Elm Street work sites, you were insubordinate, quarrelsome, subjected the Carrier to criticism and adversely affected the performance of work being conducted by a B&B crew, two signal department employees, several supervisors, yourself and a DEP official. In addition, you absented yourself from duty at the Field Road work site without a supervisors permission."

As a review of the hearing transcript attached will confirm, Mr. Worcester's supposedly "insubordinate" and "quarrelsome" behavior was questioning the safety of the work being asked of the Signal Trainee, Jeff Butland. Even the Hearing Officer understood what was really going on, when he observed on the record, "[Mr. Worcester] sounds very conscientious and I do believe that he probably had the best interest of his employee at heart but the way he went about it" Page 74. Nonetheless, Mr. Worcester was terminated for doing what he felt necessary to

protect the safety of an employee under his charge until he could get answers showing the safety concerns were being met.

The allegation of "subjecting the Carrier to criticism" supposedly stems from Mr. Pelletier's perception that the Maine DEP investigator looked at Respondent in a bad light. However, Mr. Pelletier's testimony was rife with misstatements. For example, the crux of these particular allegations against Mr. Worcester was that his actions somehow made the Maine DEP Investigator Anne Hemenway uncomfortable. Presumably when Mr. Pelletier said this under oath he only did so after verifying it with Ms. Hemenway. However, as part of my investigation into the facts, I spoke directly with Ms. Hemenway. She said that Mr. Pelletier never asked her about her discomfort, that day or at any time before or after issuing the charges. More to the point, she said that it was actually Mr. Pelletier's behavior that made her uncomfortable. In particular, she said the Mr. Pelletier approached her very aggressively and forcefully while she was speaking with Mr. Worcester, disrupting the conversation she was having with Mr. Worcester, demanding "What is he asking?", "What is he telling you?" Her response was that she was giving him her business card.

Ms. Hemenway will verify to OSHA that it was Mr. Pelletier raising his voice and approaching fast and aggressively that made her uncomfortable. Upon speaking with Ms. Hemenway you will learn that during the under 5 minute exchange with Mr. Worcester, he merely asked if a report would be prepared in connection with the spill and its clean up. She advised him that it would, and it would be made public, but that it would take some time to become available. Thus, she offered to give him a business card so that he could request it months later. They walked together to her truck so she could retrieve a business card. She can

confirm, under oath, that nothing Mr. Worcester did at the site slowed down the progress of the job or made her uncomfortable. She can actually also confirm that Mr. Butland was concerned about his ability to do the work asked of him. This hardly sounds like the picture that Mr. Pelletier testified too. And based on this information, i.e. proof that Mr. Pelletier acted precisely as he accused Mr. Worcester of acting and also that he lied under oath, presumably Mr. Pelletier will now be brought up on charges?

The allegations that Mr. Worcester "adversely affected the performance of work being conducted by a B&B crew, two signal department employees, several supervisors, yourself and a DEP official" stem from the text message that Mr. Worcester sent to Mr. Butland. However, Mr. Butland can confirm that at no time did Mr. Worcester's actions delay the progress of the work at the site. Contrary to the testimony offered by Mr. Pelletier at Mr. Worcester's hearing, Mr. Butland can verify that the only delay was waiting for a container to arrive on site, and it was during that wait that he received communication from Mr. Worcester. In fact, Mr. Butland can clarify that the text he received was not to participate in clean up of the hazardous material spill. The reason for this request by Mr. Worcester is that he knew Mr. Butland had no training in responding to hazardous material spills. In other words, he was engaging in protected safety activity.

So why was Mr. Worcester really terminated? He was terminated because the higher-ups don't like having their authority questioned, even for valid reasons. Even for federally protected safety reasons. The underlying facts are not actually disputed. Respondent just feels it has an unfettered iron fist with which it can rule its employees, and Mr. Worcester has now been made an example to all other employees of what happens when you inquire as to the safety of a given request. Is

there any doubt that Mr. Butland with less than a year on the job will keep quiet and just follow orders the next time he is told to do something, regardless of his safety concerns, considering what happened to his boss with 16 years experience?

PROPOSED FINDINGS

Respondent is a railroad carrier within the meaning of 49 U.S.C. §§ 20109 and 20102. Respondent is engaged in interstate and/or foreign commerce within the meaning of 49 U.S.C. § 20109. Complainant is a member of the Brotherhood of Railroad Signalmen (BRS). Respondent employed Complainant as a Signal Foreman.

## **RESPONDENT'S LIABILITY**

APPLICABLE PROVISIONS OF FRSA

Complainant hereby alleges that Respondent violated 49 U.S.C.§ 20109(a) and (b), which provide:

**(a)** A railroad carrier engaged in interstate or foreign commerce, a contractor or a subcontractor of such a railroad carrier, or an officer or employee of such a railroad carrier, may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful, good faith act done, or perceived by the employer to have been done or about to be done –

> **(1)** to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule, or regulation relating to railroad safety or security, or gross fraud, waste, or abuse of Federal grants or other public funds intended to be used for railroad safety or security, if the information or assistance is provided to or an investigation stemming from the provided information is conducted by—
>
>> **(A)** a Federal, State, or local regulatory or law enforcement agency (including an office of the Inspector General under the Inspector General Act of 1978 (5 U.S.C. App.; Public Law 95–452);
>> **(B)** any Member of Congress, any committee of Congress, or the Government Accountability Office; or
>> **(C)** a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct;

**(2)** to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security;

**(3)** to file a complaint, or directly cause to be brought a proceeding related to the enforcement of this part or, as applicable to railroad safety or security, chapter 51 or 57 of this title, or to testify in that proceeding;

**(4)** to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employee;

**(5)** to cooperate with a safety or security investigation by the Secretary of Transportation, the Secretary of Homeland Security, or the National Transportation Safety Board;

**(6)** to furnish information to the Secretary of Transportation, the Secretary of Homeland Security, the National Transportation Safety Board, or any Federal, State, or local regulatory or law enforcement agency as to the facts relating to any accident or incident resulting in injury or death to an individual or damage to property occurring in connection with railroad transportation; or

**(7)** to accurately report hours on duty pursuant to chapter 211.

**(b) Hazardous Safety or Security Conditions.—**
   **(1)** A railroad carrier engaged in interstate or foreign commerce, or an officer or employee of such a railroad carrier, shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for—

   **(A)** reporting, in good faith, a hazardous safety or security condition;

   **(B)** refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties, if the conditions described in paragraph (2) exist; or

   **(C)** refusing to authorize the use of any safety-related equipment, track, or structures, if the employee is responsible for the inspection or repair of the equipment, track, or structures, when the employee believes that the equipment, track, or structures are in a hazardous safety or security condition, if the conditions described in paragraph (2) exist.

   **(2)** A refusal is protected under paragraph (1)(B) and (C) if—
   **(A)** the refusal is made in good faith and no reasonable alternative to the refusal is available to the employee;

   **(B)** a reasonable individual in the circumstances then confronting the employee would conclude that—

> **(i)** the hazardous condition presents an imminent danger of death or serious injury; and
>
> **(ii)** the urgency of the situation does not allow sufficient time to eliminate the danger without such refusal; and
>
> **(C)** the employee, where possible, has notified the railroad carrier of the existence of the hazardous condition and the intention not to perform further work, or not to authorize the use of the hazardous equipment, track, or structures, unless the condition is corrected immediately or the equipment, track, or structures are repaired properly or replaced.
>
> **(3)** In this subsection, only paragraph (1)(A) shall apply to security personnel employed by a railroad carrier to protect individuals and property transported by railroad.

## ELEMENTS OF FRSA AND BURDENS OF PROOF

Actions brought under FRSA are governed by the burdens of proof set forth in the employee protection provisions of the Wendell H. Ford. Aviation Investment and Reform Act for the 21st Century. ("AIR 21") *See* 40 U.S.C. § 201209(d)(2)(A)(i). Accordingly, to prevail, a FRSA complainant must demonstrate that: (1) the employer is subject to the Act; (2) the employee is a covered employee under the Act; (3) the employee engaged in protected activity, as statutorily defined; (4) the employer knew that the employee engaged in the protected activity; (5) the employee suffered an unfavorable personnel action; and (6) the protected activity was a contributing factor in the unfavorable personnel action. *See* 40 U.S.C. § 42121(b)(2)(B)(iii); Clemmons v. Ameristar Airways Inc., et al., ARB No. 05-048, ALJ No. 2004-AIR-11, slip opinion at 3(ARB June 29, 2007).

The term "demonstrate" as used in AIR-21, and thus FRSA, means to "prove by a preponderance of the evidence." *See* Peck v. Safe Air Int'l, Inc., ARB No. 02-028, ALJ No. 01-AIR-3, slip op. at 9 (ARB Jan. 30, 2004). Thus, Complainant bears the burden of providing his case by a preponderance of the evidence. If

Complainant establishes that Respondent violated the FRSA, Respondent may avoid liability only if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of Complainant's protected behavior. *See* 49 U.S.C. §§ 20109(d)(2)(A)(i); 42121(b)(2)(B)(iii(iv).

Turning to each of these requirements specifically:

(1) the employer is subject to the Act;

It is undisputed that Respondent Pan Am Railways is an employer subject to the FRSA.

(2) the employee is a covered employee under the Act;

It is undisputed that Mr. Worcester is a covered employee under the Act.

(3) the employee engaged in protected activity, as statutorily defined;

Mr. Worcester engaged in protected activity when he sought to ensure the safety of Mr. Butland. Knowing the limits of Mr. Butland's training, knowing that the original request was not for an operator of the excavator, but instead merely someone to deliver it, and having heard that it was to be used to dig up a hazardous chemical spill, Mr. Worcester engaged in protected activity by refusing to work until these reasonable concerns were addressed. He also engaged in protected activity when he personally spoke to Ms. Hemenway from the Maine DEP.

(4) the employer knew that the employee engaged in the protected activity;

It is undisputed that Respondent knew that Mr. Worcester engaged in the protected activity. It is in fact this precise activity that prompted the charges and termination of employment.

(5) the employee suffered an unfavorable personnel action; and

It is undisputed that termination and loss of pay is an unfavorable personnel action.

(6) the protected activity was a contributing factor in the unfavorable personnel action. "A contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of railroad's decision." Thus, if the employee's protected activity played any part at all, even to the slightest degree, in bringing about the railroad's adverse discriminatory actions, then that protected activity was a contributing factor. OSHA's Final Interim Rule for "Procedures for the Handling of Retaliation Complaints under the Federal Rail Safety Act," at III. Summary and Discussion of Regulatory Provisions, Section 1982.104, quoting *Marano v. Dept. of Justice*, 2 F.3d 1137, 1140 (Fed. Cir. 1993), and 135 Cong. Rec. 5033 (1989). 29 CFR Section 1982.104; *Majali v. U.S.Dept. of Labor*, 294 Fed. Appx. 562, 566-567, 2008 U.S.App. LEXIS 29738 (11th Cir. 2008).

Thus, not only was the protected activity a contributing factor, it was in fact the sole basis for the termination. At no time did Mr. Worcester impede or prevent work. On the contrary, once he learned that Mr. Butland had adequate supervision, he backed away. Respondent violated the statutes involved when it issued the Notice to Attend Hearing, when it put Mr. Worcester out of service on November 22, 2011 without any investigation, when it forced Mr. Worcester to be driven home in a railroad police vehicle in front of his wife, children and neighbors, like a criminal, when it held the hearing, when it terminated Mr. Worcester and when it denied Mr. Worcester's appeal, upholding its original determination.

## CONCLUSION

In short, Respondent truly does not see the error of its ways or the chilling effect that its actions have on worker and public safety. Despite being repeatedly told that Mr. Worcester was looking out for the safety of his employee, the Carrier nonetheless has ensured Mr. Worcester's silence, unless his right to speak up is vindicated by these charges. Mr. Worcester is entitled to reinstatement with full back pay, plus interest, plus compensation for his stress and mental anguish and the tarnish placed on his reputation, as well as punitive damages and attorney fees and any costs related to asserting his rights. In light of the hearing transcript and supporting documentation which is attached justifying Mr. Worcester's allegations, it is respectfully requested that Respondent be ordered to preliminarily reinstate Mr. Worcester during the pendency of the investigation, or alternatively be ordered to effect economic reinstatement.

                                              Very truly yours,
                                              Flynn & Wietzke, PC

                                      By: _____
                                                 MARC WIETZKE

MW:MW
Attachments:
Notice to Attend Hearing dated October 25, 2011
Transcript of Hearing held on November 16, 2011
Notice of Termination dated November 28, 2011
Denial of Appeal of Termination dated February 24, 2012