# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| JASON WORCESTER, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) Civil No. 2:12-cv-00328-NT |
| SPRINGFIELD TERMINAL | ) |
| RAILWAY COMPANY, | ) |
| | ) |
| Defendant. | ) |

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is the Defendant's motion for summary judgment (ECF No. 33). The Plaintiff, Jason Worcester, brings a claim alleging that the Defendant, Springfield Terminal Railway Company ("**Springfield Terminal**"), charged him with company rule violations and terminated his employment because he engaged in conduct protected by 49 U.S.C. § 20109, the whistleblower provision of the Federal Railroad Safety Act ("**FRSA**"). Pl.'s Am. Compl. ("**Am. Compl.**") (ECF No. 22). The Defendant claims that Worcester cannot show that he engaged in protected conduct, a necessary element of a prima facie case of whistleblower retaliation. For the reasons that follow, the Court **DENIES** the Defendant's motion.

**FACTUAL BACKGROUND**

Because this case comes to the Court on a motion for summary judgment filed by the Defendant, the narrative below is constructed from the record evidence viewed in the light most favorable to the Plaintiff, with all reasonable inferences

resolved in the Plaintiff's favor.[1] *See Jakobiec v. Merrill Lynch Life Ins. Co.*, 711 F.3d 217 (1st Cir. 2013).

Springfield Terminal is a railroad carrier.[2] Jason Worcester worked for Springfield Terminal from 1996 until his employment was terminated on November 28, 2011.[3] At the time of his firing, Worcester was a foreman in Springfield Terminal's signal department. DSMF ¶ 58.

On October 6, 2011, over twenty gallons of hydraulic oil leaked onto a railroad bed at Elm Street in North Yarmouth, Maine. DSMF ¶¶ 4-5, 54. Springfield Terminal representatives reported the leak to Ann Hemenway, an official at the Maine Department of Environmental Protection ("**MDEP**"). DSMF ¶¶ 4-5. Hemenway made arrangements to meet Springfield Terminal's clean-up crew at Elm Street the next morning. DSMF ¶ 5.

Christopher Gessman, a Springfield Terminal bridge inspector, and Kenneth Pelletier, the assistant supervisor for Springfield Terminal's eastern division, met Hemenway at the Elm Street site. DSMF ¶¶ 6-7. Gessman's crew began removing saturated soil by digging between the railroad ties with shovels. DSMF ¶ 8. Hemenway suggested Springfield Terminal use an excavator so the crew could dig deeper and remove more soil. DSMF ¶ 8. Gessman called Worcester, who was at a nearby worksite on the Field Road in Falmouth, Maine, to request that a small

---

[1] This includes disputed facts for which the Plaintiff has offered record support.

[2] Am. Compl. ¶ 2; Def.'s Affirmative Defenses & Answer ¶ 2 (ECF No. 23).

[3] Def.'s Statement of Material Facts ("**DSMF**") ¶ 3 (ECF No. 34); Pl.'s Statement of Material Facts ("**PSMF**") ¶ 77 (ECF No. 35). Citations to paragraphs in the parties' statements of material facts incorporate the opposing parties' answers to those paragraphs.

2

excavator belonging to the signal department be brought to Elm Street. DSMF ¶¶ 10, 14; PSMF ¶¶ 91, 96, 100. Worcester did not pick up or call back, so Gessman left a voicemail and later drove to the Field Road to speak with Worcester in person. DSMF ¶ 19; PSMF ¶ 91.

Worcester expressed reservations about the plan. *See* DSMF ¶ 19. He told Gessman that he needed to speak with his union representative about whether it was appropriate for signal department employees to be involved in cleaning up hazardous materials. DSMF ¶ 19. That task was typically handled by Springfield Terminal's "Buildings & Bridges" department ("**B & B**"). DSMF ¶ 19; PSMF ¶ 87. As Worcester understood it, signalmen did not have enough training to clean up oil. DSMF ¶ 85. After Gessman left, Worcester instructed Jeremy Butland, an assistant signalman under his supervision, to deliver the excavator to Elm Street. DSMF ¶¶ 21; PSMF ¶¶ 72-73, 100. Worcester told Butland not to get involved in the clean-up and to bring back the excavator as soon as B & B was done using it. DSMF ¶ 22; PSMF ¶ 100. At the time, Butland had less than three months of experience on the job. PSMF ¶ 71. He had used the excavator for the first time less than a month before and had little experience operating it. DSMF ¶ 61; PSMF ¶ 97.

After Butland arrived at Elm Street, he was instructed to unload the excavator and use it to dig between the ties to remove saturated soil. DSMF ¶ 26. Butland told Pelletier and Gessman that he was nervous about operating the excavator "because he was green." DSMF ¶ 27; PSMF ¶¶ 102-103. Butland received a text message from Worcester reiterating that he was not to get involved in the

3

clean-up effort. DSMF ¶ 29. Stuck in the middle of a dispute between his higher-ups, Butland called Russ Libby, a lead signalman, to ask what he should do. DSMF ¶ 30. Libby told Butland to follow Pelletier's instructions. DSMF ¶ 30. Butland texted Worcester and asked him to call Pelletier. PSMF ¶ 106.

Worcester and Pelletier spoke on the phone but were not able to resolve the issue, so Worcester decided to drive to the Elm Street site himself. PSMF ¶¶ 108-109. When he arrived, he approached Hemenway, the MDEP official. PSMF ¶ 110. Worcester asked her what dangers were involved in the clean-up and whether the state would draft a report about the incident. PSMF ¶¶ 111, 114. Hemenway told Worcester that the leaked substance was hydraulic oil and that any report the MDEP drafted about the incident would be made public. PSMF ¶¶ 111, 113-14. Hemenway offered Worcester a business card and asked him to follow her to her truck. PSMF ¶ 114.

At this point, Pelletier noticed Worcester's presence and charged toward Worcester and Hemenway, demanding to know what Worcester had asked. PSMF ¶¶ 117-19. Worcester told Pelletier he was concerned about the safety of having Butland involved in the clean-up. PSMF ¶ 120. Pelletier told Worcester he could not challenge the decision because hydraulic oil is not a hazardous material.[4] *See* PSMF

---

[4] Pelletier later testified that hydraulic oil is a hazardous material and could present risks to the environment. PSMF ¶ 131. Under Springfield Terminal's "Hazard Communication Program," a policy the company established to comply with OSHA workplace safety regulations, a hazardous material is defined as "any substance or compound that has the capability of producing adverse effects on the health and safety of humans or [poses] unreasonable risk to the environment or property." PSMF ¶¶ 125, 128; *see also* 29 C.F.R. §§ 1910.1000, 1910.1200; Attach. 10 to PSMF 24 (copy of the "Hazard Communication Program"). A "Material Safety Data Sheet" used by Springfield Terminal states that hydraulic oil contains no "hazardous ingredients," but also that: (1) acute exposure to hydraulic oil can cause "[i]rriation to skin and eyes"; (2) "inhalation of hot oil mist or

4

¶ 120. Apparently angered by Worcester's obstinacy, Pelletier asked Worcester if he knew what color Pelletier's hard hat was, a reference to the fact that Springfield Terminal's supervisors wear white hard hats. PSMF ¶ 121.

On October 25, 2011, Pelletier issued charges against Worcester for allegedly being insubordinate at both the Field Road worksite and the Elm Street worksite. PSMF ¶ 133-34. A hearing was held by the company on November 6, 2011. PSMF ¶ 135. On November 28, 2011, Springfield Terminal issued Worcester a letter finding him guilty of the charges and terminating his employment. PSMF ¶ 138.

## PROCEDURAL HISTORY

On October 25, 2012, the Plaintiff brought a complaint against both the Defendant and Pelletier alleging that filing charges against him and firing him constituted FRSA whistleblower retaliation. On December 18, 2012, the Defendant filed an answer, and Pelletier filed a motion to dismiss the claim against him. On January 11, 2013, the Plaintiff filed a notice of voluntary dismissal as to his claim against Pelletier. The Plaintiff filed an amended complaint on January 30, 2013. On July 24, 2013, the Defendant filed its motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

The Court may grant a motion for summary judgment brought under Federal Rule of Civil Procedure 56 only where the movant shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of

---

vapours may irritate the upper respiratory tract"; and (3) "[r]epeated or prolonged exposure may cause dermatitis." PSMF ¶ 130; Ex. N to PSMF 1 (copy of "Material Safety Data Sheet").

5

law." Fed. R. Civ. P. 56(a). A "genuine issue" is one that a reasonable factfinder "could . . . resolve[ ] in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004) (quoted by *Jakobiec*, 711 F.3d at 223). A "material fact" is one "that has the potential of affecting the outcome of the case." *Id.* (same).

In deciding a motion for summary judgment, the Court construes the record in the light most favorable to the nonmovant and resolves all reasonable inferences in its favor. *See Jakobiec*, 711 F.3d at 223. The Court may not weigh the evidence or make credibility determinations, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), and must set aside "conclusory allegations, improbable inferences, and unsupported speculation." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (quoted by *Pina v. Children's Place*, 740 F.3d 785, 787 (1st Cir. 2014)). The motion should be denied if the nonmoving party's evidence is strong enough "to support a verdict in her favor." *Calero-Cerezo*, 355 F.3d at 19 (quoted by *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2013)). Where the reasonableness of a party's behavior is a dispositive issue, summary judgment is appropriate only where "no reasonable fact finder" could find the party's conduct reasonable under the record evidence. *Bratt v. Int'l Bus. Machs. Corp.*, 785 F.2d 352, 359 (1st Cir. 1986); *see also Candelario Del Moral v. UBS Fin. Servs. Inc. of P.R.*, 699 F.3d 93, 100 (1st Cir. 2012).

**DISCUSSION**

The Plaintiff claims that the Defendant violated the FRSA by terminating him for engaging in conduct protected by the FRSA's whistleblower provision, 49

U.S.C. § 20109 ("**Section 20109**"). The Defendant argues that the evidence in the record fails to create a genuine issue of material fact as to whether the Plaintiff engaged in any whistleblowing activity protected by Section 20109.

I.   **The Governing Law**

To establish a prima facie case of FRSA whistleblower retaliation against an employer subject to the FRSA, an employee must establish four elements: (1) that the employee engaged in activity protected by Section 20109;[5] (2) that the employer knew the employee engaged in protected activity; (3) that the employee suffered an unfavorable personnel action; and (4) causation. *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3rd Cir. 2013). Only the first element is at issue on this motion.

The Defendant argues that Worcester did not engage in any protected conduct under Section 20109. The Plaintiff contends that a reasonable fact finder could conclude that Worcester's conduct satisfied four[6] of Section 20109's subsections: (1) Subsection (a)(1)(A); (2) Subsection (a)(1)(C); (3) Subsection (a)(2);[7]

---

[5]   Section 20109 protects thirteen different types of conduct as whistleblowing activity. *See* 49 U.S.C. § 20109(a)(1)(A) through § 20109(b)(1)(C).

[6]   In its motion for summary judgment, the Defendant discusses all four of these subsections in detail. Def.'s Mot. for Summ. J. 4-8. Near the beginning of its opposition to the Defendant's motion, the Plaintiff writes that "a reasonable jury could find that Mr. Worcester satisfies the requirements of three separate provisions of the statute, namely 49 U.S.C. § 20109(a)(1)(C), 49 U.S.C. § 20109 (a)(2) or 49 U.S.C. § 20109(b)." Pl.'s Opp'n 3 (ECF No. 18). The omission of subsection (a)(1)(A) appears to have been a typographical error, as the opposition goes on to discuss that subsection as well. *See* Pl.'s Opp'n 7.

[7]   Together, Subsections (a)(1)(A), (a)(1)(C), and (a)(2) protect an employee's

   **(a)** . . . lawful, good faith act done, or perceived by the employer to have been done or about to be done—

7

and (4) Subsection (b)(1)(A).⁸ To knock this case out on a motion for summary judgment, the Defendant needs to show that no rational factfinder could find that *any* of the subsections apply. Because the Court determines that the Plaintiff has established a prima facie case under Subsection (b)(1)(A), it does not go on to address whether the Plaintiff can establish protected conduct under the other subsections.⁹

Subsection (b)(1)(A) protects an employee for "reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(A). By its own terms, Subsection (b)(1)(A), protects only "good faith" reporting. *Id.* Unlike several of Section 20109's other subsections, it contains no explicit requirement that the employee's actions be objectively "reasonabl[e]." *Compare* 49 U.S.C. § 20109(b)(1)(A) *with* 49 U.S.C. § 20109(a)(1). Given the inherent ambiguity of the term "good

---

> **(1)** to provide information, directly cause information to be provided, or otherwise directly assist in any investigation regarding any conduct which the employee reasonably believes constitutes a violation of any Federal law, rule or regulation relating to railroad safety . . . if the information or assistance is provided to . . .
>
> **(A)** a Federal, State, or local regulatory or law enforcement agency . . . . ; [or]
>
> . . .
>
> **(C)** a person with supervisory authority over the employee or such other person who has the authority to investigate, discover, or terminate the misconduct . . . . [or]
>
> **(2)** to refuse to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security.

49 U.S.C. § 20109(a)(1) & (2).

⁸ Subsection (b)(1)(A) protects an employee for "reporting, in good faith, a hazardous safety or security condition . . . ." 49 U.S.C. § 20109(b)(1)(A).

⁹ The Court will entertain pretrial motions on the other subsections at the appropriate time.

8

faith,"[10] it is unclear whether a plaintiff can satisfy Subsection (b)(1)(A) merely by establishing that he held an honest, subjective belief that there was a hazardous safety or security condition, or whether the plaintiff must also establish that this belief was objectively reasonable. Because the Court finds below that the Plaintiff states a plausible claim under Subsection (b)(1)(A) even if its "good faith" standard does have an objective element, the Court does not need to resolve this question.

## II. Application of Subsection (b)(1)(A) to the Facts of the Case

### A. Subjective Honesty-in-Fact

On the facts presented, a rational fact finder could reach the conclusion that Worcester "report[ed]" to his employer what he subjectively believed was a "hazardous safety . . . condition." 49 U.S.C. 20109(b)(1)(A). Worcester expressed reservations to Gessman about using the signal department's excavator to assist in the clean-up effort. *See* DSMF ¶ 19; PSMF ¶¶ 85, 87. It is undisputed that Worcester subjectively believed signalmen have insufficient training to clean up oil. PSMF ¶¶ 85. Worcester spoke with Pelletier and raised safety concerns about having Butland involved. PSMF ¶ 120. It is undisputed that Butland had little experience in operating an excavator, and even Pelletier testified that Worcester's concerns about Butland were not disingenuous. PSMF ¶¶ 97, 136. An employee

---

[10] In some instances, the term "good faith" is used to refer to a belief that is subjectively honest, whether the belief is reasonable or not. *Cheek v. United States*, 498 U.S. 192, 203 (1991) (holding that defendant's "good-faith belief" that he did not violate tax laws immunized him from criminal liability even though belief was not "objectively reasonable"). In other instances, the term "good faith" is used to refer only to beliefs that are both subjectively honest and objectively reasonable. *Reid v. Key Bank of S. Me., Inc.*, 821 F.2d 9, 15 n.2 (1st Cir. 1987) (noting that some courts interpret "good faith" requirements in the Uniform Commercial Code to impose both a subjective honesty-in-fact standard and an objective reasonableness standard). Neither party has cited any cases which conclusively clear up the ambiguity or directly interpret the language of Subsection (b)(1)(A).

9

taking on a task he cannot safely complete could constitute a "hazardous safety . . . condition." 49 U.S.C. 20109(b)(1)(A). Warning a supervisor about such a condition could constitute "reporting." *Id.* Accordingly, taken in the light most favorable to the Plaintiff, the record evidence supports a conclusion that Worcester reported what he subjectively believed was a hazardous safety condition to both Gessman and Pelletier.

### B. Objective Reasonableness

As of October 7, 2011, Butland had been working for Springfield Terminal for less than three months and had only operated the signal department's excavator for the first time weeks earlier. PSMF ¶¶ 71, 97. He himself told Pelletier and Gessman that he was nervous about operating the excavator. PSMF ¶ 103. Furthermore, hydraulic oil qualifies as a "hazardous material" under Springfield Terminal's own internal safety policies. PSMF ¶ 132. Given that questions of "reasonableness" are generally for the jury, *see Bratt*, 785 F.2d at 359, these facts are sufficient to create a genuine issue as to whether Worcester reasonably believed that the conditions on the ground and Butland's lack of experience combined to create a hazardous safety condition at the Elm Street site on October 7, 2011.

### CONCLUSION

Because evidence in the record could support a conclusion that Worcester reported what he subjectively and reasonably believed was a hazardous safety condition, there is a genuine issue as to whether Worcester engaged in activity

protected by Subsection (b)(1)(A). Accordingly, the Defendant's motion for summary judgment is **DENIED**.


SO ORDERED.

/s/ Nancy Torresen<br>United States District Judge

Dated this 31st day of March, 2014.